

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TM/EAG/EP
F.#2010R18030

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 6, 2013

By ECF

The Honorable Carol B. Amon
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Lopez-Perez, et al., 11-CR-199 (CBA)

Dear Chief Judge Amon:

The government respectfully submits this letter in advance of sentencing in this case, which is scheduled for November 21, 2013, at 11:00 a.m. On that date, the Court is scheduled to sentence defendants Benito Lopez-Perez, Anastasio Romero-Perez and Jose Gabino Barrientos-Perez.

I. Factual Background

As detailed in the PSRs, the defendants in this case participated in a sex trafficking conspiracy involving the transportation of women and girls from Mexico to the United States for the purpose of having the females work in prostitution. Lopez-Perez Pre-Sentence Investigation Report ("Lopez-Perez PSR") ¶¶ 4-11; Romero Perez Pre-Sentence Investigation Report ("Romero-Perez PSR") ¶¶ 3-10; Barrientos-Perez Pre-Sentence Investigation Report ("Barrientos-Perez PSR") ¶¶ 3-10. The trafficking conduct underlying the offenses of conviction involved four victims, Jane Does #1 through #4. The defendants, who are brothers, utilized different methods to force these women and girls to work in prostitution, ranging from abduction, rape, beatings and threats of violence, to psychological coercion. As detailed in the PSRs and the affidavits of Jane Does #1, #2 and #3, which are attached to the government's sentencing submission as Exhibits A through C, each of the defendants played a role in this sex trafficking conspiracy.

Jane Doe #1 was primarily trafficked by defendant Benito Lopez-Perez. Jane Doe #1 met Lopez-Perez in 2005 in Mexico when she was 14 years old. Jane Doe #1 Aff. ¶ 2. After attending a movie with a group of friends that included Lopez-Perez, he took Jane Doe #1 to his family home and raped her. Id. After that point, Lopez-Perez forced Jane

Doe #1 into prostitution, first in Mexico and then, after arranging to smuggle her across the border, in the United States. Lopez-Perez PSR ¶¶ 13-15; Romero-Perez PSR ¶¶ 12-14; Barrientos-Perez PSR ¶¶ 12-14. After arriving in the United States, Jane Doe #1 encountered defendant Barrientos-Perez (whom she knew as "Ricardo"). Jane Doe #1 Aff. ¶¶ 8 & 12. Once in the United States, Jane Doe #1 was required to service 10 to 40 clients per day, on threat of being beaten. Lopez-Perez PSR ¶ 15; Romero-Perez PSR ¶ 14; Barrientos-Perez PSR ¶ 14. Jane Doe #1 was kept under Lopez-Perez's control for five years, until she escaped in 2010. Lopez-Perez PSR ¶ 16; Romero-Perez PSR ¶ 15; Barrientos-Perez PSR ¶ 15.

Jane Doe #2 was primarily trafficked by defendant Anastasio Romero-Perez. When she was 14 years old, Jane Doe #2 met Romero-Perez while she was living with her sister (Jane Doe #3), who was married to defendant Jose Gabino Barrientos-Perez. Lopez-Perez PSR ¶ 17; Romero-Perez PSR ¶ 16; Barrientos-Perez PSR ¶ 16. After Jane Doe #3 left for the United States, Jane Doe #2 moved in with Romero-Perez and they began a romantic relationship. Id. Romero-Perez asked Jane Doe #2 to work in prostitution in order to pay off a debt that he had; Jane Doe #2 initially refused, but Romero-Perez pressured her until she gave in. Jane Doe #2 Aff. ¶ 6. After that, Romero-Perez took Jane Doe #2 to a bar where she was monitored constantly to ensure that she did not take any of the money she earned. When she refused to work, or did not earn enough money, Romero-Perez beat her. Id. ¶ 7. Thereafter, in approximately October 2008, Romero-Perez and Lopez-Perez made arrangements for Jane Doe #2 to be smuggled across the border, and she was brought to New York City. Id. ¶ 9. After arriving in the United States, Jane Doe #2 worked as a prostitute in New York, New Jersey and Connecticut, servicing approximately 12 to 15 clients per day. Lopez-Perez PSR ¶ 19; Romero-Perez PSR ¶ 18; Barrientos-Perez PSR ¶ 18. While she was in the United States, Romero-Perez raped and beat Jane Doe #2 on several occasions. Jane Doe #2 Aff. ¶ 14. In 2010, Jane Doe #2 eventually located her sister, Jane Doe #3, and Jane Doe #2 left Romero-Perez and moved into an apartment with her sister in Queens. Id. ¶ 16.

Jane Doe #3 was primarily trafficked by defendant Jose Gabino Barrientos-Perez. Jane Doe #3 met Barrientos-Perez in 2002, when she was approximately 15 years old, after which she and Barrientos-Perez began a romantic relationship. Lopez-Perez PSR ¶ 21; Romero-Perez PSR ¶ 20; Barrientos-Perez PSR ¶ 20. Approximately one year[1] after the birth of their son, Barrientos-Perez asked Jane Doe #3 if she would start work as a prostitute. Initially, she refused, but Barrientos-Perez pressured her, saying that they needed the money to pay for their debts and to take care of their baby (who was born prematurely, resulting in substantial medical bills). Jane Doe #3 Aff. ¶ 3. Jane Doe #3 finally gave in and agreed to work as a prostitute. Id. Thereafter, between approximately 2004 and 2006, Barrientos-Perez took Jane Doe #3 to Tijuana and Mexico City to work in prostitution; Barrientos-Perez beat her on several occasions in order to force her to work. Id. ¶¶ 4-5. In 2006, Barrientos-

[1] The government notes that the PSR inaccurately states that this occurred approximately one month after the birth of Jane Doe #3's son. Compare Lopez-Perez PSR ¶ 21; Romero-Perez PSR ¶ 20; Barrientos-Perez PSR ¶ 20 with Jane Doe #3 Aff. ¶ 3.

Perez sent Jane Doe #3 to the United States with smugglers. Id. ¶ 7. In New York City, Jane Doe #3 worked in prostitution; Barrientos-Perez threatened to beat Jane Doe #3 if she did not want to work or if she did not make enough money. Id. ¶ 8. Thereafter, in the late summer of 2006, Jane Doe #3 returned to Mexico to see her children; Barrientos-Perez made her reenter the United States illegally in May 2007 so she could continue to work in prostitution. Id. ¶ 10. In or about September 2007, Jane Doe #3 told Barrientos-Perez that she no longer wanted to be with him or work as a prostitute and she returned to Mexico. Id. ¶ 11. At some point in 2009, Barrientos-Perez again ordered Jane Doe #3 to return to the United States to work as a prostitute; Jane Doe #3 wired Barrientos-Perez approximately $700-$1,000 or more every week from her prostitution earnings. Id. ¶ 12. In approximately July 2009, Jane Doe #3 began wiring Barrientos-Perez less money, in response to which Barrientos-Perez became angry and threatened that he would not let Jane Doe #3 see her children if she did not send him more money. Id. ¶ 13. In 2010, Jane Doe #3 discovered that her sister, Jane Doe #2, had also been forced into prostitution, by Barrientos-Perez's brother, defendant Romero-Perez. Id. ¶¶ 14-15.

Jane Doe #4 was trafficked by Romero-Perez at the age of 20. Lopez-Perez PSR ¶ 24; Romero-Perez PSR ¶ 23; Barrientos-Perez PSR ¶ 23. In approximately 2009, a sister of Romero-Perez approached Jane Doe #4's parents and asked them if Jane Doe #4 could serve as a babysitter for her family. A week later, the sister returned and brought Jane Doe #4 and another young woman, identified herein as Jane Doe #5, to the sister's residence. There, Romero-Perez and Lopez-Perez pressured Jane Doe #4 to begin a romantic relationship with Romero-Perez. For example, after Jane Doe #4 initially refused Romero-Perez's advances, Lopez-Perez told her that Romero-Perez would commit suicide if she did not relent. Eventually, Jane Doe #4 began a romantic relationship with Romero-Perez and shortly thereafter, Romero-Perez asked Jane Doe #4 to work as a prostitute. When she refused, Romero-Perez told her that she must not love him. During this time, Jane Doe #4 did not know where in Mexico she was and Romero-Perez refused Jane Doe #4's requests to return to her parents' home or even call her parents. Ultimately, Jane Doe #4 relented and Romero-Perez took her to Puebla, Mexico, where she served as a prostitute. When she tried to resist working as a prostitute, Romero-Perez would pull her hair and scream at her. On one occasion while Jane Doe #4 was working, Jane Doe #4 encountered Jane Doe #5, who was also working as a prostitute. Jane Doe #5 told Jane Doe #4 that Lopez-Perez had made her live with him and work as a prostitute and directed that if she encountered Jane Doe #4, she was not to speak with her or Lopez-Perez would beat her.

After about three months of working as a prostitute in Mexico, Jane Doe #4 was smuggled into the United States. Id. Romero-Perez promised Jane Doe #4 that they would get jobs and have an apartment together, but after they arrived, Romero-Perez told her that she needed to prostitute herself to support them. Like Jane Does #1, 2 and 3, Jane Doe #4 gave the majority of the proceeds to Romero-Perez and his family members.

II. The Defendants' Guilty Pleas

On May 20, 2013, all three defendants pled guilty to sex trafficking charges related to their involvement in this conspiracy. Specifically, the defendants pled guilty to the following counts:

| **Defendant** | **Charges** | **Victims** |
| --- | --- | --- |
| Benito Lopez-Perez | - Sex trafficking of a child, Jane Doe #1, in or about and between January 2009 and August 2010, in violation of 18 U.S.C. § 1591(a)(1) & 1591(b)(2) (a lesser-included offense of Count Four)<br><br>- Knowingly and intentionally transporting Jane Doe #3 in interstate commerce, in or about April 2006, in violation of 18 U.S.C. § 2421 (Count Twelve) | Jane Doe #1 (for Count Four)<br><br>Jane Doe #3 (for Count Twelve) |
| Anastasio Romero-Perez | - Sex trafficking of a child, Jane Doe #2, in or about and between January 2009 and August 2010, in violation of 1591(a)(1) & 1591(b)(2) (a lesser-included offense of Count Five) | Jane Doe #2 |
| Jose Gabino Barrientos-Perez | - Sex trafficking of a child, Jane Doe #1, in or about and between July 2005 and December 2008, in violation of 1591(a)(1) & 1591(b)(2) (a lesser-included offense of Count Three)<br><br>- Knowingly and intentionally transporting Jane Doe #3 in interstate commerce, in or about April 2006, in violation of 18 U.S.C. § 2421 (Count Twelve) | Jane Doe #1 (for Count Three)<br><br>Jane Doe #3 (for Count Twelve) |

The government's Guidelines estimates for each of the defendants are detailed in their respective plea agreements, which are attached hereto as Exhibits D through F. Specifically, for Benito Lopez-Perez, the government estimated the Adjusted Offense Level as level 38. Reducing that level by two points for acceptance of responsibility, the offense level estimated in the plea agreement was level 36, with a Guidelines imprisonment range of 188 to 235 months. Pursuant to the terms of his plea, other than requesting that "the sentence imposed by the Court should be reduced by the duration of time that the defendant was incarcerated in Mexico as a result of his extradition to the United States," Lopez-Perez agreed not to advocate in any way for a sentence less than 188 months. Lopez-Perez Plea Agmt. ¶ 2.

For defendant Romero-Perez, the government estimated the applicable offense level as level 38. Subtracting two levels for acceptance of responsibility, the offense level estimated in the plea agreement was level 36, with a Guidelines imprisonment range of 188

to 235 months. Pursuant to the terms of his plea agreement, other than requesting that "the sentence imposed by the Court should be reduced by the duration of time that the defendant was incarcerated in Mexico as a result of his extradition to the United States," Romero-Perez likewise agreed not to advocate in any way for a sentence less than 188 months. Romero-Perez Plea Agmt. ¶ 2.

For defendant Barrientos-Perez, the government estimated the applicable offense level as level 32. Subtracting two levels for acceptance of responsibility, the adjusted offense level estimated in the plea agreement was level 30, with a Guidelines imprisonment range of 97-121 months. Notably, the charge to which Barrientos-Perez pled guilty carries a statutory mandatory minimum of 120 months.

## III. Applicable Guidelines

The Guidelines calculations in the PSRs differ from those in the plea agreements in two significant respects. First, the Probation Department applied Guideline § 2A3.1 instead of § 2G1.3 as to each of the defendants. Second, the Probation Department did not include relevant conduct as to additional victims in its calculations. These discrepancies are discussed below, as are the Guidelines applicable to each defendant.

### A. Applicability of § 2A3.1

Section 2G1.3(c)(3) of the Guidelines provides that "[i]f the offense involved conduct described in 18 U.S.C. § 2241 or § 2242, apply §2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse), if the resulting offense level is greater than that determined [under 2G1.3]."[2] During plea negotiations, the government inadvertently failed to consider the applicability of this cross-reference. Had it considered it, the government may have concluded, as the Probation Department did, that to the extent it resulted in a greater offense level, it would apply as to Lopez-Perez and Romero-Perez. However, the government respectfully submits that it would have concluded that § 2A3.1 is not applicable to Barrientos-Perez. As set forth above and in the PSRs, Lopez-Perez and Romero-Perez respectively used force against Jane Doe #1 and Jane Doe #2, each of whom were minors at the time, during the commission of the offense. By contrast, Barrientos-Perez did not use force against any of the victims during the commission of the offense.[3] Although it may

---

[2] Application note 5 sets forth the conduct described in 18 U.S.C. § 2241 or § 2242 to include, inter alia, "engaging in, or causing another person to engage in, a sexual act with another person: (I) using force against the minor; (II) threatening or placing the minor in fear that any person will be subject to death, serious bodily injury, or kidnapping;" and "(I) engaging in, or causing another person to engage in, a sexual act with another person by threatening or placing the minor in fear (other than by threatening or placing the minor in fear that any person will be subject to death, serious bodily injury, or kidnapping) . . . ."

[3] While the PSR asserts that defendant Barrientos-Perez "continued to beat" Jane Doe #3 after she came to the United States, Lopez-Perez PSR ¶ 22; Romero-Perez PSR ¶ 21;

have been foreseeable to Barrientos-Perez that force and threats of force would be used during the course of the trafficking Jane Doe #1, she has not alleged that Barrientos-Perez beat her or threatened to beat her. Given the fact that Jane Doe #1 has not identified Barrientos-Perez as an individual who physically abused her, and the government cannot prove that Barrientos-Perez was aware of Lopez-Perez's beatings, the government's estimate of the applicable Guidelines for Count Three was based on Guideline § 2G1.3, as discussed further below. In addition, as also discussed in more detail below, the PSR's calculation of the Guidelines as to Count Twelve (the Mann Act charge involving Jane Doe #3) is inaccurate, and should not be based on § 2A3.1.

Notwithstanding the foregoing, because the government did not include the application of the cross-reference in the plea agreement and in an abundance of caution, the government does not now seek a sentence above the Guidelines calculation included in the defendants' plea agreements. However, the government respectfully submits that the Court should impose a sentence at the high end of the applicable guidelines for defendants Lopez-Perez and Romero-Perez, who utilized rape, beatings and threats of violence to commit the trafficking offenses to which they pled guilty.

B. Relevant Conduct & The Applicable Guidelines

1. Lopez-Perez

The other significant discrepancy between the Lopez-Perez PSR and the government's estimate of the applicable Guidelines is that the PSR does not incorporate any analysis of relevant conduct attributable to Lopez-Perez for the trafficking of Jane Doe #2 and Jane Doe #4. Compare Lopez-Perez Plea Agmt. pp. 4-5 with Lopez-Perez PSR ¶¶ 39-58. As demonstrated, the approaches taken by the Probation Department and the government to calculate the Guidelines in this case were different in concept: the government focused on the trafficking activity that occurred in the United States as the conduct underlying the offense of conviction and sought to account for all four of the Jane Does as to which the

---

Barrientos-Perez PSR ¶ 21, this is not accurate. Although Jane Doe #3 was physically abused in Mexico before the commencement of the trafficking offense to which Lopez-Perez and Barrientos-Perez pled guilty, the defendants did not use physical force against Jane Doe #3 in order to force her into prostitution in the United States. (See Aff. of Jane Doe #3 ¶¶ 4, 7-13). Rather, once in the United States, Barrientos-Perez principally used psychological coercion to force Jane Doe #3 to work, in that he threatened that he would not let her see her son if she did not continue to work in prostitution. Due to this factual inaccuracy, the PSR recommends a cross-reference to § 2A3.1 with regard to Count Twelve, as well as a four-level enhancement in the Guidelines calculation for Count Twelve. Lopez-Perez PSR ¶ 47. However, for the reasons discussed below, in sub-section (B)(4), the four-level enhancement does not apply to Count Twelve, and the cross-reference to § 2A3.1 for Count Twelve is not warranted.

government had evidence, while the Probation Department concluded that the conduct involved the type of forcible sex proscribed by 18 U.S.C. § 2241.

The government's Guidelines calculation for Lopez-Perez thus took into consideration the defendant's guilty plea to Count Twelve. The PSR likewise took Count Twelve into consideration, but the PSR's Guidelines calculation is based on an erroneous understanding of the facts underlying that count, as discussed supra note 3. Specifically, the Lopez-Perez PSR calculates the Guidelines applicable for Count Twelve at an adjusted offense level of 36. The cross-reference to § 2A3.1 is not, however, appropriate as to Count Twelve. Rather, an Adjusted Offense Level of 20 applies to Count Twelve, as set forth in the plea agreements. See Lopez-Perez Plea Agmt. p. 4; Barrientos-Perez Plea Agmt. p. 4.[4]

2. Romero-Perez

As noted in the Romero-Perez Sentencing Memorandum ("Romero-Perez Mem."), the government's estimate of the applicable Guidelines and the PSR's estimate of the Guidelines are the same: both calculations estimate the applicable Guidelines at a level 36, with a Guidelines imprisonment range of 188-235 months. Romero-Perez Mem. at 6, n.3. The difference in the calculations stems from the Probation Department's use of the cross-reference to Guideline 2A3.1, but the PSR also omits calculations for relevant conduct pertaining to another victim (Jane Doe #1).[5] Similar to the approach taken to the Guidelines

[4] Should the Court adopt the PSR's recommendation of an Adjusted Offense Level of 40 for Count Four, but also properly calculate the Guidelines for Count Twelve, the discrepancy between the government's estimate of the Guidelines and the PSR's estimate is reduced. Specifically, for Count Four, the PSR calculates the Guidelines at a level 40, by starting at a Base Offense Level of 30, and applying a four-level enhancement for using means set forth in 18 U.S.C. § 2241 (§ 2A3.1(b)(1)), a four-level enhancement for abduction (§ 2A3.1(b)(5)), and a two-level vulnerable victim enhancement (§ 3A1.1(b)(1)). Lopez-Perez PSR ¶¶ 39-45. If the Court adopts the government's estimate of the Guidelines for Count Twelve (an adjusted offense level of 20), the Guidelines would then call for no additional units to be added in the multiple count analysis, due to the fact that the Adjusted Offense Level applicable to Count Twelve is 20 levels less than the PSR's estimate of the Adjusted Offense Level for Count Four. See § 3D1.4. With a two-level reduction for acceptance of responsibility, the Total Offense Level for Lopez-Perez would then be a level 38, which carries a Guidelines imprisonment range of 235-293 months. As noted above, the government's estimate in the plea agreement was a level 36, with a Guidelines imprisonment range of 188 to 235 months.

[5] At various points in the Romero-Perez PSR, it states that after Jane Doe #2 began working in prostitution in Mexico, she was raped by customers at a bar. See Romero-Perez PSR ¶¶ 17 & 27. As set forth above, Jane Doe #2 explained in her affidavit that she eventually "gave in" to Romero-Perez's pressure to work in prostitution; she does not mention being raped by clients.

estimate for Lopez-Perez, the government's estimate was based on Guideline 2G1.3, including the applicable enhancements under that Guideline, and utilized a multiple count analysis to account for relevant conduct attributable to Romero-Perez as to both Jane Doe #2 and Jane Doe #1. However, because the government accounted for an additional victim not considered by the Romero-Perez PSR, the ultimate Guidelines calculation is the same.

3. Barrientos-Perez

As discussed above, the core discrepancy in the Guidelines analysis as to Barrientos-Perez flows from the Probation Department's incorrect attribution of significant physical violence to this defendant. Paragraph 27 of the PSR for Barrientos-Perez states that Barrientos-Perez "used physical force and threats of physical force against Jane Doe #1 in the instant offense." Barrientos-Perez PSR ¶ 27. Based on that assertion, which is inaccurate, the PSR recommends that the Court utilize a cross-reference to Guideline 2A3.1, rather than refer to Guideline 2G1.3, as anticipated by the parties' plea agreement. As discussed above, although it may have been foreseeable to Barrientos-Perez that force and threats of force would be used during the course of the trafficking Jane Doe #1, she has not alleged that Barrientos-Perez beat her or threatened to beat her. For these reasons, the government's estimate of the applicable Guidelines for Count Three (involving Jane Doe #1) was based on Guideline § 2G1.3. Using the 2G1.3 Guideline as the starting point, the government estimated four levels of upward adjustments and also afforded Barrientos-Perez a minor role deduction, as he was already in the United States when Lopez-Perez brought Jane Doe #1 to the United States,[6] and played a comparatively minor role in her trafficking. The government thus estimated the adjusted offense level as to Count Three for Barrientos-Perez at a level 32. See Barrientos-Perez Plea Agmt. pp. 4-5.

As discussed above in sub-section (B)(1), the PSR for Barrientos-Perez is also inaccurate regarding what happened with victim Jane Doe #3, the victim underlying the Mann Act charge alleged in Count Twelve. The PSR asserts that Barrientos-Perez "continued to beat" Jane Doe #3 after she came to the United States. Barrientos-Perez PSR ¶ 28. This is not accurate. Although Jane Doe #3 was physically abused in Mexico before the commencement of the trafficking offense to which Lopez-Perez and Barrientos-Perez pled guilty, the defendants did not use physical force against Jane Doe #3 in order to force her into prostitution once in the United States. (See Aff. of Jane Doe #3 ¶¶ 4, 7-13). Rather, once in the United States, Barrientos-Perez at times threatened force and used psychological

[6] For these same reasons, the government does not believe that the Court should adopt the Probation Department's recommendation to apply the abduction enhancement set forth at Guideline 2A3.1(b)(5) to Barrientos-Perez. Although it is factually accurate that Lopez-Perez abducted Jane Doe #1 in Mexico, the cross-reference to the 2A3.1 Guideline is not applicable to Barrientos-Perez for the reasons discussed above. Moreover, Barrientos-Perez was not involved in the abduction of Jane Doe #1 because he was already in the United States when Lopez-Perez abducted Jane Doe #1 in Mexico; there is no evidence to suggest that he knew about or assisted in the abduction.

coercion to require Jane Doe #3 to work, in that he threatened that he would not let her see her son if she did not continue to work in prostitution.

Based on this factual inaccuracy, the PSR recommends a cross-reference to Guideline 2A3.1 with regard to Count Twelve, as well as a four-level enhancement in the Guidelines calculation for Count Twelve. Barrientos-Perez PSR ¶ 44. This enhancement is not factually appropriate. Accordingly, the four-level enhancement does not apply to Count Twelve, and the cross-reference to Guideline 2A3.1 for Count Twelve is not warranted. The Guidelines for both Lopez-Perez and Barrientos-Perez as to Count Twelve should thus be calculated as set forth in the defendants' plea agreements.

## IV. Analysis

In the Supreme Court's opinion in United States v. Booker, 543 U.S. 220 (2005), which held that the Sentencing Guidelines are advisory not mandatory, the Supreme Court made clear that district courts are still required to consider Guidelines ranges in determining sentence, but also may tailor the sentence in light of other statutory concerns. See 18 U.S.C. § 3553(a).

Thereafter, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

As set forth above, pursuant to the terms of their plea agreements, Lopez-Perez and Romero-Perez are not permitted to seek a sentence less than the 188 months estimated in their plea agreements, with the exception for a reduction of time based on the defendants' being in custody in Mexico while awaiting extradition. In the case of Barrientos-Perez, although the estimated Guidelines range is 97-121 months, the applicable statutory mandatory minimum is 120 months. Accordingly, in their submissions, the defendants seek sentences at the low end of what is required pursuant to the terms of their plea agreements.

### A. Lopez-Perez

Defendant Lopez-Perez expressly acknowledges in his sentencing memorandum dated October 30, 2013 ("Lopez-Perez Mem.") that he is bound by the terms of his plea agreement not to advocate in any way for a sentence less than 188 months, with the exception of the request for a reduction for the time that Lopez-Perez was incarcerated in Mexico while awaiting extradition. Lopez-Perez Mem. at 4. Lopez-Perez also notes that his client has serious medical conditions, including diabetes, serious pain and discomfort in his

back and leg, and a skin infection or skin tag and fistula. Id. at 5. The sentencing memorandum also discusses the defendant's impoverished upbringing and lack of education. Id. at 6. The defendant also submitted numerous letters in support, some of which seek leniency or ask for a "fair" sentence. In conclusion, Lopez-Perez submits that a sentence of 188 months will fulfill the statutory objectives of sentencing. Lopez-Perez Mem. at 8.

Nothing about the defendant's background or personal circumstances warrants leniency in the face of the extremely serious criminal conduct in which the defendant engaged, and as to which he has admitted his responsibility. With regard to his impoverished background, for example, the defendant is similarly situated to all defendants who engage in criminal activity, in part due of financial necessity. See, e.g., United States v. Vera Ramos, 296 Fed. App'x 201, 203-04 (2d Cir. Oct. 21, 2008) (affirming Guidelines sentence despite defendant's "'difficult upbringing' and 'very substantial family responsibilities'" and noting district court's observation that such circumstances are "almost universal" among defendants in similar cases). Moreover, the defendant's involvement in trafficking four victims from Mexico to the United States with the intent to force them into prostitution and his use of violence merit a sentence that reflects the seriousness of the offense and deters criminal conduct. See 18 U.S.C. § 3553(a). The government thus respectfully submits that the Court should sentence the defendant to the high end of the 188-235 month Guidelines range estimated in the plea agreement. See Lopez-Perez Plea Agmt. at 5-6.

B. Romero-Perez

Defendant Romero-Perez seeks a sentence of 175 months, submitting that the low end of the applicable Guidelines range (188 months) should be reduced by thirteen months to account for the time that Romero-Perez spent incarcerated in Mexico. Romero-Perez Mem. at 6. As set forth in his sentencing memorandum and the parties' plea agreement, Romero-Perez, like his brother Lopez-Perez, is not permitted to seek a sentence less than 188 months, with the exception for a reduction of time spent in custody in Mexico awaiting extradition. In his memorandum, Romero-Perez describes his dedication to his family, his hard work in attempting to lift his family out of extreme poverty and his commitment to his extended family and community, which is demonstrated by numerous letters submitted in support of Romero-Perez, which are attached to his sentencing submission.

Much like Lopez-Perez, nothing about Romero-Perez's background or personal circumstances warrants leniency by this Court. The crime of conviction is extremely serious, and the Court should fashion a sufficiently severe sentence so as to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The government respectfully submits that a sentence at the high end of the 188-235 month Guidelines range estimated in the plea agreement would be such a sentence.

C. Barrientos-Perez

Defendant Barrientos-Perez seeks a sentence of essentially 120 months, the applicable statutory mandatory minimum. Barrientos-Perez Sentencing Memorandum dated October 23, 2013 ("Barrientos-Perez Mem.") at 4. This request is premised on the argument that the Guidelines calculated by the Probation Department were in error (as to which the government agrees as to Barrientos-Perez), and seeks to have the Court consider that Barrientos-Perez served six months in Mexican custody while awaiting extradition. For the reasons set forth above, the government respectfully submits that the Court should sentence Barrientos-Perez to a sentence within the 120-121 month range anticipated by the plea agreement. Barrientos-Perez Plea Agmt. p. 5.

V. Conclusion

For the foregoing reasons, the government respectfully submits that sentences within the Guidelines ranges estimated in the plea agreements for defendants Lopez-Perez, Romero-Perez and Barrientos-Perez are appropriate. In addition, due the regular and extreme violence utilized by Lopez-Perez and Romero-Perez during the commission of the offense, the government respectfully submits that the Court should sentence these defendants at the high end of the estimated range, namely, to 235 months of imprisonment.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: /s/ Taryn A. Merkl
Taryn A. Merkl
Elizabeth A. Geddes
Erik D. Paulsen
Assistant U.S. Attorneys
(718) 254-6064/6430/6135

cc: Clerk of Court (CBA)
All counsel (by ECF)
U.S. Probation Officers Victoria M. Aguilar, Angelica Deniz & John J. Lanigan